RAFAEL CUEBAS FERNÁNDEZ ET AL., Plaintiffs and Appellants, *v.* THE PORTO RICAN & AMERICAN INSURANCE COMPANY, Defendant and Appellee.

No. 150. Decided June 12, 1962.

*Jorge Sous* for appellants. *Córdova & González* and *Héctor Martínez Muñoz* for appellee.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

Minor Rafael Cuebas Fernández and his parents, Rafael Cuebas Polanco and Nora Fernández, brought an action against the Porto Rican and American Insurance Company claiming damages sustained by the said minor as a result of the impact of a .22 caliber pellet shotgun on June 26, 1957 and of the acts of Francisco Rovira Fernández, also a minor. The complaint was predicated on the defendant company's liability under a policy issued in favor of Francisco Rovira Graña. According to the conditions of that policy, the term "insured" included, in addition to the insured, the latter's relatives who lived in his home, among whom was his son Francisco Rovira Fernández. The contract of insurance imposed on the insured, among others, the following obligations:

(a) to give forthwith written notice of the accident to the insurer or to any of its agents, which notice shall contain all the information which the insured could reasonably obtain in connection with the place, the hour, and circumstances of the accident, and the name and address of the person injured and of the eyewitnesses; (b) to co-operate with the company; (c) to appear at the hearings and trials which may be necessary to give testimony in connection with the case; (d) to assist the company in effecting any compromise in connection with the claim.

After a trial on the merits the superior court rendered judgment exonerating the defendant company from liability on the ground that the insured had breached the condition of the policy imposing on him the obligation to co-operate with the insurer. That is precisely the main issue involved in this appeal.

We have said that the accident occurred on June 26, 1957. Three days later insured Francisco Rovira Graña gave written notice of the accident to the insurance company, through its Mayagüez agent, describing it as follows: "the child Rafael Cuebas was playing in the yard with a pellet which he found and the youngster Francisco Rovira Fernández took it from him and started to strike it on the primer with an instrument, and when it exploded the pellet injured the little boy." The report of the accident, which is a printed form furnished by the company, set forth the place and hour of the accident, the nature of the wound received by the injured child, the name of the clinic where he was hospitalized and of the attending physician. It was further informed that no claim had yet been made in connection with the accident, but that they would. In a footnote of the printed form it was also stated that it had not been reported to the police.

The version of the accident was furnished to Mr. Rovira, since he did not witness it.

On September 1, 1957, Rafael Cuebas Polanco, the father of the injured child, wrote a letter to José Luis Colón, adjuster of the defendant company, informing him of the accident and inquiring as to the result of the investigation conducted by the company and its attitude in the case before making claim through judicial channels. The insurer did not answer that letter. On October 25, 1957 attorney Blanco Lugo wrote to the defendant company informing it that he had assumed the representation of the plaintiffs in the claim for an accident which occurred on June 26, 1957 and which was covered by the public-liability policy issued by that company in favor of Rovira Graña. In that letter the said attorney urged the insurer to accept its liability, and informed it that he was in the best disposition to meet with the company for the purpose of discussing and settling the matter satisfactorily. The letter was not answered either. In the same month of October 1957, according to the uncontroverted evidence in the record, the attorney for the plaintiffs urged personally Mr. Colón, adjuster and chief of the Claims Department of the company, to give him an answer on the matter, to which the latter replied that the company had no liability because they could prove that the father of minor Rovira had acted as a good father of family. On two or three subsequent occasions the attorney met adjuster Colón and gave him the account of the accident which the plaintiff child had given him, and which was to the effect that the child had been the victim of a shot which had come out of a shotgun manipulated by young Rovira.[1]

---

[1] It was the attorney himself for the insurer, Martínez Muñoz, who verified the correctness of the statements made by the attorney for the plaintiffs on the steps taken with adjuster Colón in connection with the case. When the question of the admissibility of the copy of the letter of October 25, 1957, addressed by the attorney for the plaintiffs to the company, was being discussed, the following took place:

"Mr. Blanco Lugo: The colleague admits that it was never answered?

On October 11, 1957 the company wrote a letter to Mayagüez police headquarters requesting copy of the entry in the police blotter of the accident which occurred on June 26. There was no such entry at that time because the accident had not been reported to the police. As a result of the company's request, the police conducted an investigation in December 1957. In that investigation the only ones questioned were minor Francisco Rovira Fernández, who gave the same version which his father had already given to the company, and the mother of the injured child who stated that there was no criminal intention on the part of Rovira Fernández in that accident.

The complaint was filed in July 1958, after more than one year had elapsed from the date of the accident. Three months later, in October of that year, the defendant filed its answer denying almost all the facts of the complaint and alleging as special defense that the complaint did not allege facts constituting a cause of action because it did not contain any averment of negligence. An interrogatory was enclosed with the answer, which the plaintiffs answered in October. The answer to question number 4 of the interrogatory is as follows:

"4. The plaintiff minor suffered the impact of a pellet in the region of the liver. The impact was produced by a .22 caliber shotgun belonging to Noé Fernández Pabón of Cabo Rojo, Puerto Rico. When the accident occurred the shotgun was being manipulated by Francisco Rovira Fernández."

Thereupon the company agents talked with Francisco Rovira Graña and for the first time with his son Francisco Rovira Fernández. On December 12, 1958 both subscribed

"Mr. Martínez Muñoz: I can not admit that, but I know for a fact that colleague Blanco Lugo approached Mr. Colón and myself in order to discuss this. Yes, we admit that it was received."
Furthermore, adjuster Colón did not take the witness stand to deny or contradict at all the testimony of the attorney for the plaintiffs.

a statement for the company setting forth what follows on the occurrence of the accident:

"On the day of the occurrence I was in the yard of my house firing with a .22 caliber shotgun. When the child Rafaelito Cuebas tried to take the shotgun away from me, he grabbed it by the barrel and it went off injuring the child."

After obtaining this statement the defendant company filed an amended answer on December 29, 1958 raising for the first time the defense of lack of co-operation of the insured and alleging that it had been seriously prejudiced, for the following reasons:

"(a) That in the Notice of Accident sent to the defendant he gave another version which was irreconcilable with the version given several days ago to the undersigned attorney, and because of the existing relationship between the parties he knew that one version does not reflect the reality of this occurrence. (b) That the truthfulness of either version has been defeated and the defendant prejudiced in the defense of its interests because of the adverse effect which the account of the two versions, coming from the same source and which are irreconcilable between themselves, will produce in the Hon. Court."

The trial was held on March 6, 1959, that is, after more than two months had elapsed since the company filed its amended answer raising the defense of lack of co-operation of the insured. Two versions of the accident were offered at the trial. One, by minor Rovira Fernández who gave the same version which he had given in writing to the company in December 1958. Evidence was also offered that this minor had given to the district attorney the other version that the accident had occurred when he exploded the pellet with a stone. The other version was given by the prejudiced child, according to which Rovira Fernández was in the yard of his house firing with a .22 caliber rifle at some pigeons.

All of a sudden he turned around and the shot went off injuring his cousin Rafael Cuebas Fernández in the abdomen.[2]

As to the manner in which the accident occurred, the trial judge made the following findings of fact:

"1. On June 26, 1957 the minor plaintiff, Rafael Cuebas Polanco (*sic*), received a pellet wound from a rifle which went off accidentally to his cousin Francisco Rovira Fernández who was at that time about 17 years of age, while both minors were in the yard of the residence of the parents of minor Francisco Rovira Fernández, Francisco Rovira Graña, and his wife Elida Fernández Pabón.

. . . . . . . .

"14. The trial of the case was held March 6, 1959. In connection with the manner in which this accident occurred, the only two persons who witnessed the occurrence testified: The injured minor Rafael Cuebas Fernández and the youngster who caused the damage, Francisco Rovira Fernández. The minor plaintiff, who is at present 8 years of age, testified that his cousin Francisco Rovira was on his knees firing at some pigeons which were on the roof of a neighboring house; that he was standing behind his cousin watching him fire because his cousin had invited him to come down to the yard and watch him fire, and that all of a sudden Paquito turned around with the knee on the ground and the shot went off injuring him in the abdomen. Francisco Rovira Fernández, who was called to testify by the insurance com-

---

[2] The child Rafael Cuebas testified, briefly, that he was his cousin's pal, that they used to play together, and that he sojourned at times in his house; that on the day of the accident, around 12 noon, his cousin was in the yard of his house firing a rifle at some pigeons and asked him to watch him fire; that while his cousin was in a squatting position, he turned around suddenly and fired at him; that his cousin got up immediately, picked him up in his arms, and took him to the kitchen where his cousin's mother was. We copy from the stenographic record:

"Q. And what were you doing there?
A. He had asked me to watch him fire.
Q. And what happened after that?
A. I was standing behind him and all of a sudden he turned around and fired at me.
    Mr. Martínez Muñoz: What?
    Mr. Blanco Lugo: 'He turned around and fired at me.'
    Mr. Martínez Muñoz: Did he look?
    Mr. Blanco Lugo: He turned around.

pany, testified that the accident occurred when he and his cousin Rafael Cuebas both tried to pick up the pellet rifle which was on the ground in order to fire at some pigeons, that Rafael Cuebas grabbed the rifle by the barrel and the shot went off at that moment. The insurance company was necessarily bound to impeach only the credibility of Francisco Rovira and of his father Francisco Rovira Graña whose testimonies were disbelieved by the court, the only acceptable version of the facts under the court's consideration being that offered by the minor plaintiff."

In its conclusions of law the trial court stated as follows:

"And the case at bar is one of those cases in which, in our opinion, the complete lack of co-operation of the insured and of his son with the insurance company not only placed the defendant in a position of indefense, but also that the conduct of the insured and of his son, coupled with the attitude of the plaintiffs' and of their attorney in refusing to disclose information to the defendant on the occurrence of the accident until a few months prior to the trial when they answered the interrogatory of the defendant, all of which, coupled with the close relationship of the parents of these two minors and the fact that the accident was never notified to the authorities, led the insurance company with full justification to assume an attitude of suspicion in re-

---

Mr. Blanco Lugo:
Q. In what position was your cousin before firing?
A. Squatting.
Q. Could you step down from the chair and show to the judge the position in which he was?
A. Like this.
    Mr. Blanco Lugo: For the purposes of the record, let it be known that the child has left the witness stand and has adopted a position with the right knee on the floor and the other knee in an angle of approximately, ninety degrees. Rather, the other leg in an angle of more or less ninety degrees.
    (To the child) Take your seat again.
Mr. Blanco Lugo:
Q. What movement did your cousin make after that position which you have just indicated?
A. He turned around like this.
Q. Will you be kind enough to come back here—will the court please pardon the inconvenience—and show the manner in which your cousin acted?

fusing to compromise the case out of court. It is obvious that that fact alone is sufficient damage to justify the release of the defendant company from the obligation contracted with the insured under the insurance policy. *Buffalo* v. *U.S. Fidelity & G. Co.*, 84 F.2d 883; *Hoffman* v. *Labutzke*, 289 N.W. 652, 233 Wis. 365 (1940).

"The contradictions of Francisco Rovira Graña and of his son as to the manner in which this accident occurred deprived the company completely of witnesses who could throw light on the truthfulness of the occurrence of this unfortunate accident. And neither did the company have available the result of an effective police investigation, since the insured minor himself was the only one who testified before the police as to the manner in which this accident had occurred, and also on that occasion Francisco Rovira gave the same false version of the facts which he had given originally to the company in the notice of the accident, and repeated that version before the authorities with the implied acquiescence of his parents and of the parents of the injured minor.

"In order to ascertain the truthfulness of the manner in which this accident actually occurred, the only thing the insurance company could do was to resort to the plaintiff. And although the version offered by the minor plaintiff at the trial seems the most credible, considering all the circumstances of this case, we can not blame the company for not relying on that

---

Mr. Blanco Lugo: For the purposes of the record, let it be known that the child has adopted the original position and has described a circular form.

Mr. Martínez Muñoz: In a swift movement.

Mr. Blanco Lugo: In a swift movement.

Hon. Judge:

Q. When it went off, was he still on his knees?

A. No. He got up rapidly. I was standing and fell from the chair and he picked me up.

Mr. Blanco Lugo:

Q. How was that?

A. He fired at me rapidly and threw the rifle down rapidly and picked me up.

Q. Step up... What did you feel?

A. Pains in the abdomen.

Q. Where did you receive the shot?

A. In the yard.

Q. But in what part of your body?

version in ascertaining the manner in which this accident occurred, particularly since the mother of the minor plaintiff implicitly consented to the first version of the facts which her nephew first gave in her presence to the police and then to the district attorney when the case was investigated at the request of the insurance company."

In *Faulkner* v. *Nieves*, 76 P.R.R. 407, we ratified the principle that the clause requiring co-operation with the insurer in an insurance policy was wholly valid, and that the failure of the insured to comply therewith generally precludes him from recovery thereon. However, that general principle has multiple exceptions. As one of those exceptions we had already pointed out in *Colón* v. *Government of the Capital*, 62 P.R.R. 24, 37, that the claimant for damages can be protected against such defense by notifying the insurance company of the occurrence of the accident, joining it as a party defendant when filing his action and summoning and serving it with copy of the complaint. We also held in the *Faulkner* case that in order that the nonperformance of the obligation to give written notice of the accident may relieve the insurer from liability, the latter must show that such

---

A. Here.

Mr. Blanco Lugo: He is pointing to the abdomen.

Mr. Blanco Lugo:

Q. Have you any scar as a result of that accident?

A. Yes.

Q. Will you be kind enough to show the Judge?

A. (The child is showing.)

Mr. Blanco Lugo: Does your Honor wish to make any observation in the record?

Hon. Judge: Remove your hand... Come here. (The child moves over.) The child presents in the abdomen, to the right of the navel, about one inch to the right of the navel, a long scar which gives the impression of being an operation scar, is it so?

Mr. Blanco Lugo: Exactly.

Hon. Judge: A scar about three and a half or four inches long and above the scar there is a point about one and one-half inches above the navel, and to the right there is a scar more or less round, about one-half or three-fourths inch in diameter.

nonperformance resulted in substantial prejudice. "The word 'cooperation' within a liability policy as the one involved herein, means that there shall be a fair and frank disclosure of information reasonably demanded by the insurer to enable it to determine whether there is a genuine defense with respect to the claim made. *Ocean Accident & Guarantee Corporation* v. *Lucas*, 74 F.2d 115, 117; *Coleman* v. *New Amsterdam Casualty Co.*, 160 N.E. 367, 369; 139 A.L.R. 784; *General Casualty & Surety Co.* v. *Kierstead*, 67 F.2d 523, 525. The insured, we repeat, did not give such information in the instant case, but the aggrieved party himself gave it and was always willing to give it. That, in our opinion, is sufficient, not precisely because the information given placed the insurer in a position to determine whether or not it had a good defense, but because it placed it in a position to carry out immediately any pertinent investigation and to conclude whether or not its insured was guilty." *Faulkner* v. *Nieves*, 76 P.R.R. 407, 412–13. See, also, *Landol* v. *Colón*, 78 P.R.R. 572, and *Lafontaine* v. *Municipality*, 79 P.R.R. 548.

▇ In order that the lack of cooperation of the insured may relieve the insurer from liability, it must be in some

---

Mr. Blanco Lugo: Thank you, Your Honor.
Sit over there, Rafaelito.

Mr. Blanco Lugo:

Q. So you say that after your cousin did that to you, what happened?

A. He picked me up and took me to the kitchen where my aunt was and turned me over to her.

Q. And what did you feel at that moment?

A. Pains in the abdomen.

Q. Were you conscious?

A. Yes.

Q. Where did they take you after that?

A. Clínica Perea.

Q. When you arrived at the clinic, did you walk up by yourself?

A. No. I was sort of dizzy.

Q. How was your eyesight?

A. Going around in circles.

Q. After you arrived at the clinic, what happened?

A. After that I don't know anything else." (Pp. 12-16 of the stenographic record.)

material and substantial aspect which may cause him prejudice.[3]

■■■■ The purpose of the cooperation clause which imposes on the insured the obligation to disclose to the insurer all the information which he may reasonably obtain in connection with the circumstances of the accident is to give the insurer an opportunity to prepare it to resist any claim or to determine whether it has a legitimate defense. Sometimes the first information which the insured transmits to the insurer is incorrect and untrue as to the circumstances of the accident, but that fact by itself does not always necessarily constitute a breach of the cooperation clause, especially in the absence of fraud, collusion, or purpose to prejudice the insurer. A like principle is generally applicable when the insured alters or repudiates his original version of the accident. In order to determine whether the variance between the first version of the accident furnished by the insured to the insurer and subsequent versions by the former constitute a breach of the cooperation clause, it is necessary to consider the nature of the variance and its effect with respect to the situation in which the insurer is placed to resist a claim. It is unquestionable, therefore, that in many cases a substantial, intentional, or fraudulent disclosure may place the insurer in a state of indefense or may deprive it of the opportunity to compromise the claim.[4] In such case the cooperation clause would release the insurer from liability.

[3] *Broussard* v. *Broussard,* 84 So. 2d 899; *Curran* v. *Connecticut Ind. Co.,* 20 A.2d 87.

[4] See notes in 34 A.L.R.2d 264; 79 A.L.R.2d 1040; 139 A.L.R. 771; 98 A.L.R. 1465; 72 A.L.R. 1446; 8 APPLEMAN, Insurance Law and Practice 143, § 4783; 2 RICHARDS, Insurance 1188, § 361; 29A Am. Jur. 34, § 789 *et seq.; Broussard* v. *Broussard,* 84 So.2d 899; *Norwich Union Indemnity Co.* v. *Hass,* 179 F.2d 827; *Nationwide Mutual Insurance Co.* v. *Burka,* 134 A.2d 89; *State Automobile Ins. Co.* v. *York,* 104 F.2d 730; *Bernadich* v. *Bernadich,* 283 N.W. 5; *Farmers Automobile Inter-Insurance Exch.* v. *Konugres,* 202 P.2d 959.

■ In the instant case we can not agree with the trial court that the insured breached the cooperation clause to such an extent as to relieve the insurer from liability. According to the first version of the accident furnished to the insurer three days after its occurrence, the insurance company was liable for the damages sustained by the plaintiffs. Likewise it was liable for such damages according to the first version given to the company by minor Francisco Rovira Fernández after the complaint was filed and which the minor ratified in court during the trial. Even though the third version produced in court by the plaintiff minor varied the details of the accident, it established fundamentally the fact that the shot which injured the minor went off from a rifle negligently manipulated by Rovira Fernández. And the trial court rightly concluded, in our opinion, that according to the plaintiff's version, which it considers the most credible of all, the insurer was liable as well as under the other two versions. We know from the facts already related that the defendant had knowledge of plaintiffs' version in October 1957, or about 10 months before the complaint was filed. Despite the fact that before filing the complaint they invited the defendant, through their attorney, to discuss the matter and effect a compromise, if possible, the defendant refused to do so. Furthermore, after the defendant learned of the version of the accident which the insured would give in court, more than two months elapsed before the trial was held and the insurer, which had knowledge of the different versions which always held it responsible, never made attempts to compromise the claim.

Apparently it rested on the fact that since the insured had given two different versions of the accident which were at variance with that of the plaintiffs, it was exonerated from liability under the policy conditions. It therefore relied on a technical defense based on certain facts which did not

prevent it from preparing itself to resist the claim and much less to reach a compromise.

In its conclusions of law the trial court held that the lack of cooperation of the insured placed the insurer in a state of indefense, and that in view of the conduct of the insured and of his son as well as of their attorney, coupled with the closed relationship of the parents of the minors involved in the accident, created justifiedly in the mind of the insurer an attitude of suspicion whereby it was fully justified in refusing to effect an extrajudicial compromise of the case, it being obvious that that fact alone is sufficient damage to relieve it from the obligation contracted in the insurance policy. It cites the cases of *Buffalo* v. *U. S. Fidelity & G. Co.*, 84 F.2d 883, and *Hoffman* v. *Labutzke*, 289 N.W. 652, 233 Wis. 365. In the first of those cases Buffalo's automobile was covered by a public-liability policy. The coverage was limited to accidents occurring while the automobile was being personally driven by Buffalo or under the personal supervision of one Jolley while acting in the capacity of chauffeur of Buffalo. The automobile was involved in a bad collision with that of Wyer. The latter sued Buffalo and the insurance company defended him without waiving its rights under the policy. Buffalo had informed the company in writing that neither he nor Jolley were in the automobile when the accident occurred, which clearly excluded such accident from the policy coverage. Evidence was introduced at the trial that Buffalo and Jolley were in the automobile at the time of the occurrence. The jury brought a verdict ordering Buffalo to pay damages to Wyer. When the latter sued the insurance company to collect the judgment, the action was dismissed on the ground that Buffalo had breached the cooperation clause in testifying wilfully and falsely that neither he nor Jolley was in the automobile at the time of the accident. Obviously, in that case the insured prevented the insurer from compromising the

claim. That is why the misstatement made by Buffalo prejudiced the insurer's interests.

In the *Hoffman* case the misstatement made by the insured shifting the blame for the accident on a nonexistent person also prevented the insurer from compromising the claim instead of defending the case on the merits, wherefore it was held that the insured had breached the cooperation clause to the prejudice of the insurer. In both cases the action of the insureds caused substantial prejudice to the insurers, wherefore the effect of the breach of the cooperation clause was to relieve the insurers from liability.

In this case, however, there was nothing to indicate to the insurer that it could resist successfully the claim which it had been informed three days after the accident would be made against it. It had knowledge before the filing of the complaint that the accident was due to the insured's negligence, either under the original version of the latter or under the version of the plaintiff. Even before the trial it had knowledge sufficiently in advance of the version which the insured would give at the trial to compromise the claim if it had wanted to. None of these three versions could induce it to believe that it had a good defense against the claim. This being so, the alleged defense that the defendant would be prejudiced by the adverse effect which the two contradictory versions of the same accident, coming from the same source, would produce in the court falls by the wayside.

On the other hand, the record does not show that the insured gave contradictory information to the insurer, in bad faith, for the purpose of defrauding the same or creating a state of indefense. Youngster Rovira Fernández admitted from the beginning that he was the cause of the accident, and it is not difficult to understand that the failure to mention the rifle was due to the fear of being involved in a criminal action rather than to the fear of defrauding the insurer, since according to his original version (to strike

the pellet with a stone) the accident was covered by the policy, as would be the case if the pellet had been discharged by a rifle negligently manipulated by Rovira Fernández.

Nor is there evidence of collusion between the parents of both minors. What the record rather shows is that the close relationship existing between them cooled after the accident to the point that they stopped visiting each other.

In one of its conclusions of law the trial court states as follows:

"It is true that under any of the three versions of the accident given by the two minors involved the company would be liable for the damages sustained by the plaintiffs, but there is no assurance to the defendant company nor to this court that the accident in this case actually occurred in one of the three ways described and not in another manner as a result of which the damage would not be covered by the terms of the policy.

"The only fact which may be considered as definitively established in this case as to the occurrence of the accident is that the shot which injured the minor plaintiff was discharged by a pellet shotgun manipulated by Francisco Rovira Fernández and that it was fired at a short distance, but this does not rule out by itself the possibility that the accident would have occurred in some other way which would relieve the insurance company from liability under the terms of the policy, as would be the case if the injured minor had incurred contributory negligence. And in that case, even if the company were not relieved from liability, such contributory negligence of the victim would reduce substantially the amount of the compensation which the company would have been bound to pay. This would be another valid argument to hold that the false versions of the facts given to the company by the insureds, coupled with the attitude of reservation and implied acquiescence assumed by the plaintiff, constitute another substantial damage reasonably foreseeable by the insurance company."

As direct evidence of the facts, only two versions were actually given as to how the accident occurred, one by Rovira Fernández and the other by the plaintiff child. The first version (that of the stone and the pellet) could only be given

for the purpose of impeaching the testimony of Rovira Fernández or establishing the fact that the insured had given two different versions to the insurer. Without basis therefor, the trial court did not give credit to any of the versions, although under any of them the insurer was liable for damages, and conjectured as to the possibility that the accident would have occurred in some other way from which it could appear that the damage was not covered by the terms of the policy. This conclusion is actually based on a presumption of collusion or fraud, but it is not supported by the whole of the evidence, nor does the latter lead to such inference. The accident was witnessed only by the two children involved. It occurred in the yard of a residence where there was no other person at that moment who could testify on the occurrence. Hence, only the parties involved in the accident could offer evidence on the occurrence. The plaintiff child never made statements at variance with his testimony at the trial, he was never investigated by the insurer, nor by the police or the district attorney. His testimony as to the occurrence of the accident could be considered as impeached by Rovira Fernández, who gave a different version. However, the testimony of Rovira Fernández would not have been sufficient to discredit the testimony of the plaintiff child, since even before the latter testified the judge had already stated that he did not give credit to Rovira Fernández. Truly, we find no reasonable basis for not giving credit to the plaintiff minor.[5] The fact that there is such variance between the testimony of the plaintiff minor and that of Rovira Fernández rather favors the inference of lack of collusion.

It is error to assert that, assuming that there was contributory negligence in the accident on the part of the plaintiff minor, the insurance company would be relieved from liability and that even though it were not relieved from

---

[5] See *Comm'r of Education* v. *Dist. Court; Feliciano, Int.*, 74 P.R.R. 306.

liability, the contributory negligence of the victim would reduce substantially the amount of indemnity which the company would have been bound to pay. But the fact is that, even assuming that the accident would have occurred in such imaginary form, the contributory negligence would have been no defense for the insurer, not even to reduce the amount of damages, because the child involved was only six years of age. See *Irizarry* v. *People*, 75 P.R.R. 740, and cases cited at p. 745.

■ We conclude that the facts and circumstances of this case do not show breach of the cooperation clause resulting in substantial prejudice to the insurer and, hence, that it is relieved from liability.

Since we are in a position to render the judgment which the trial court should have rendered, let us consider the nature of the damages sustained by the plaintiffs in order to fix the amount thereof.

Referring to the insurance company's lack of opportunity to reduce the amount of its liability, the trial court added: "that in this case, considering the substantial policy coverage and the severity of the damages sustained by the injured child and by his parents, there is no question that it would have amounted to a considerable sum." This is actually true.

When the plaintiff child arrived at the clinic he was in a state of shock and complained of pain in the abdomen. He presented a pellet wound in the hepatic region, the right side. The wound was the size of a one-half dollar coin, or perhaps smaller, and was bleeding. The patient underwent a surgical operation and his abdomen was opened. They found a bleeding wound in the liver. The liver was sutured, some loose pellets were removed from the abdomen, which was then closed with drainage. Doctor Nelson Perea testified that the case was serious and he so told the child's family, by se-

rious meaning that the child could die any moment, and that such seriousness lasted three days during which he was given blood transfusions. The child was confined in the clinic approximately 10 or 12 days and afterwards received ambulatory treatment for about five or six weeks. Twenty-one months after the accident the child still had 40 or 50 pellets incrusted in the liver and the peritoneum. Those pellets can not be removed and although it is natural that they will have no consequences, any of them may cause inflammation at any moment and it would be necessary to remove them. Doctor Perea also testified that he can not determine whether the presence of foreign bodies in the child's organism may have serious consequences, and that the only way to determine otherwise would be to remove all of them, which he does not recommend because of their great number.

Considering all these circumstances as well as the physical and mental suffering of the plaintiff minor, we believe that the amount of $15,000 is just compensation for him.

In order to have an idea of the intensive and prolonged mental anguish and suffering of the child's parents, it is well to recall that they knew that their child was lingering between life and death during three days and that even after that he remained in the hospital for seven or eight more days, apart from the uncertainty of the possible future consequences of the pellets incrusted in the child's body.

For that account they should be awarded an indemnity of $8,000. Furthermore, the defendant should be ordered to pay the sum of $720 for medical fees and hospital expenses, plus the costs and $1,000 for attorney's fees.

The judgment rendered by the Mayagüez Part of the Superior Court will be reversed and another judgment rendered pursuant to the terms hereof.